UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| YONEL MAXIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00994-TWP-DLP |
| | ) | |
| JOHN LAYTON, BEN LOUZON, | ) | |
| JOSE QUINONES, JAMES ELLIS, | ) | |
| JASON LAKAS, JOSHUA JORDAN, | ) | |
| TYLER MCCARTHY, JUSTIN LAMB, | ) | |
| JASON CARNES, MICHAEL JABKIEWICZ, | ) | |
| ROBERT AMOS, SMITH Corporal, | ) | |
| SHANIKA BULLOCK, CHAD MEEKS, | ) | |
| JAMES KOERS, COX Corporal, | ) | |
| DEIDRE BAKER, and CORRECT CARE | ) | |
| SOLUTIONS, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANT CORRECT CARE SOLUTIONS'
MOTION TO DISMISS**

This matter is before the Court on a second Motion to Dismiss Plaintiff's First Amended Complaint filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendant Correct Care Solutions ("CCS") ([Filing No. 53](#)). Plaintiff Yonel Maxis ("Maxis") initiated this action, seeking monetary damages for violations of his Fourth and Fourteenth Amendment rights while he was incarcerated in the Marion County Jail. CCS successfully moved to dismiss Maxis' *Monell* claim against it, and Maxis filed an Amended Complaint, realleging the *Monell* claim. CCS again has moved to dismiss Maxis' sole claim against it, arguing that the allegations in the Amended Complaint fail to not support a *Monell* claim against CCS. For the reasons stated below, the Court **grants** CCS's second Motion to Dismiss.

# I. BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of Maxis as the non-moving party. *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). The facts of this case are set forth in detail in the Court's Order on CCS's first motion to dismiss at Filing No. 43 at 2–4 and will thus are only summarized, with the exception of additional facts based on the allegations in the Amended Complaint.

Maxis, a native of Haiti, speaks Haitian Creole and knows only a few words in English. When he tried to board an IndyGo bus on July 20, 2017, he encountered a language barrier and was prevented from boarding the bus. Indianapolis Metropolitan Police Department officers arrived, noted a language barrier, and tried to communicate with Maxis using hand signals. They eventually handcuffed Maxis and pulled him away from the scene. Maxis was suffering from a mental impairment at the time of his arrest. He was taken to the Arrestee Processing Center. Thereafter, in the early morning hours of July 21, 2017, Maxis was transported to the Marion County Jail. Upon arrival at the Marion County Jail, he was placed in a cell (Filing No. 47 at 4–6).

CCS contracts with the Marion County Sheriff's Office to provide medical care and treatment to inmates at the Marion County Jail. *Id.* at 4. CCS Registered Nurse Erica Morris ("RN Morris") completed an initial screening of Maxis. RN Morris used the "language line" and Google to translate when communicating with Maxis. She marked answers for each question, but no signature was captured from Maxis. RN Morris found that Maxis had no lesions or abrasions and determined that he could be placed in general population. RN Morris also noted that Maxis

answered "no" to all questions concerning the use of narcotic drugs and that she did not observe any physical marks indicative of drug abuse. *Id.* at 6.

Licensed Practical Nurse Jhervon Gunn ("LPN Gunn") interacted with Maxis at approximately 6:40 a.m. on July 21, 2017. In his notes, LPN Gunn explained that Maxis spoke very little English but was able to make gestures and followed commands. LPN Gunn had access to the language line and a translator but failed to utilize either of those services. Because of the language barrier, LPN Gunn could not directly communicate with Maxis regarding his condition. *Id.*

During his first day at the Marion County Jail, RN Abimbola Modupe-Fry ("RN Modupe-Fry") noted that Maxis was offered Gatorade at approximately 1:30 p.m. RN Modupe-Fry did not use the language line or a translator for this interaction. As a result of the language barrier, she could not directly communicate with Maxis regarding his condition. *Id.* at 7. At approximately 3:57 p.m., LPN Tracy Roberts ("LPN Roberts") completed a "Pre-Segregation Health Assessment" form. LPN Roberts noted that Maxis spoke no English. LPN Roberts did not use the language line or a translator for the assessment. LPN Roberts could not directly communicate with Maxis regarding his condition. She took some but not all of Maxis' vital signs; she took his pulse but not his blood pressure. He noted that Maxis was anxious, but his speech was normal, and Maxis did not have any lesions or abrasions. LPN Roberts cleared Maxis for segregation. Maxis had not ingested any narcotics nor did any of the CCS medical staff with whom Maxis interacted note that he exhibited any signs of narcotic ingestion. *Id.* at 7–8.

On July 22, 2017, Michael Schrettenbrunner ("Schrettenbrunner"), a CCS employee, evaluated Maxis and completed a "Suicide Watch Daily Follow Up / Discharge" form. Schrettenbrunner indicated that Maxis was on suicide watch because of suicidal ideation or threat.

Schrettenbrunner noted that Maxis was sleeping and would not wake up, but he was breathing. He determined that Maxis' risk of suicide was high and that he should continue on suicide watch. However, Schrettenbrunner did not use the language line or a translator for this evaluation ([Filing No. 47 at 9](#)).

On July 23, 2017, Schrettenbrunner again evaluated Maxis and completed a "Suicide Watch Daily Follow Up / Discharge" form. During the evaluation, Schrettenbrunner noted that he could not understand Maxis because he was speaking a foreign language, and he appeared to be African. Maxis was anxious and had pressed speech. Schrettenbrunner did not use the language line or a translator to evaluate Maxis or to determine that he had suicidal ideation or threats. Because of the language barrier, Schrettenbrunner could not directly communicate with Maxis regarding his condition. However, Schrettenbrunner still determined that Maxis had a high risk of suicide and that he should continue on suicide watch. *Id.* at 9–10.

On July 24, 2017, prior to Maxis being taken to court, Megan Andrews ("Ms. Andrews"), a CCS employee, evaluated Maxis and completed a "Suicide Watch Daily Follow Up / Discharge" form at approximately 12:32 p.m. Ms. Andrews noted that Maxis was nude because of flooding in his cell. She noted that Maxis did not appear to speak English and that she intended to use the language line to assist with his assessment after he returned from court. Ms. Andrews did not use the language line or a translator to evaluate Maxis, so she could not directly communicate with him about his condition. She concluded that Maxis had a low risk of suicide, but he should continue on suicide watch with his property allowed. *Id.* at 10.

During the evening of July 24, 2017, jail staff entered Maxis' cell and forcibly pushed him into the bunk and wall. They issued three strikes to his forearm, three strikes to his peroneal nerve, utilized a pain point located behind his ear and jaw, deployed the cartridge function of a taser, and

deployed two drive stuns with the taser. The jail staff called CCS staff to remove the taser prongs from Maxis. CCS staff members LPN Marsha Williams ("LPN Williams"), Nikia, Shelby, and Rachel were present. An "Emergency Response Worksheet" was completed by a nurse employed by CCS. LPN Williams noted that she could not take Maxis' blood pressure because his handcuffs were so tight. Throughout this encounter, the language line and a translator were not used by the medical staff. Thus, the CCS staff could not directly communicate with Maxis about his condition. *Id.* at 10–11.

On July 25, 2017, at approximately 12:30 p.m., Ms. Andrews again evaluated Maxis and completed a "Suicide Watch Daily Follow Up / Discharge" form. During the evaluation, Ms. Andrews observed that Maxis was laying on the floor of his cell block. When he attempted to move, Maxis appeared to have difficultly lifting himself up to his bunk. Ms. Andrews noted that Maxis was of average intelligence, had intact but poor insight, and intact but poor judgment. It also was noted that he was withdrawn. A translator was called to assist with this evaluation. Maxis indicated that he could not get up, that he was weak, that he had been refusing food, and that he was scared and did not understand what was happening over the last few days. LPN Rachel Allen also interacted with Maxis during this time and noted that he was shaky and looked like he was not feeling well. She shared this information with the night shift staff. *Id.* at 12.

Also on July 25, 2017, LPN Tamnil Hill, ("LPN Hill"), interacted with Maxis and noted that other inmates indicated that Maxis was not eating his meals and was giving away his food. LPN Hill indicated that Maxis appeared fatigued and weakened, and he appeared to have no sensation in his left leg, which was swollen. LPN Hill noted that jail staff was arranging for a translator to assist with the communication barrier. *Id.*

5

On July 26, 2017, CCS staff interacted with Maxis and noted that his left leg was not moving, that his extremities were cold, and that he had not eaten in six days. They also noted that his skin was "pink." LPN Nakia Murrell ("LPN Murrell") also interacted with Maxis and noted that a "language barrier prevented communicating simple commands causing subject to become agitated and resistive." (Filing No. 47 at 13.) LPN Murrell found a wound on Maxis' left foot that had minimal bleeding. The wound was cleaned and bandaged. CCS staff indicated that they could not get a history from Maxis because of communication issues. They did not use the language line or a translator to evaluate Maxis or directly communicate with him about his condition. Maxis underwent a CT scan, x-ray, and ultrasound, and it was decided that he needed to be transported to Eskenazi Hospital for further treatment. Maxis was hospitalized at Eskenazi Hospital from July 26, 2017 through August 4, 2017. He was then released to family members and returned home to Florida. *Id.*

Maxis filed this lawsuit on March 29, 2018, asserting claims against John Layton (the Sheriff of Marion County, Indiana), numerous law enforcement officers, and CCS. Maxis requested monetary damages for his claims of violation of his Fourth and Fourteenth Amendment rights against law enforcement officers, *Monell* claims against Sheriff Layton, and a *Monell* claim against CCS (Filing No. 1). On April 19, 2018, CCS filed its first motion to dismiss, asking the Court to dismiss the *Monell* claim asserted against it. The Court granted CCS's first motion to dismiss, dismissing the *Monell* claim asserted against CCS and granting leave to Maxis to amend his Complaint to cure his pleading deficiencies (Filing No. 43 at 9). On December 21, 2018, Maxis filed his Amended Complaint, alleging the same claims against the same defendants with a single *Monell* claim against CCS (Filing No. 47). On January 9, 2019, CCS filed the instant Motion, asking the Court to dismiss the *Monell* claim asserted against it (Filing No. 53).

## II. **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

### III. **DISCUSSION**

CCS argues—as it did with its first motion to dismiss—that Maxis has failed to plead a sufficient factual basis to support a *Monell* claim against it. To allege a viable *Monell* constitutional claim, a plaintiff must allege with sufficient facts that he suffered a constitutional deprivation as the result of an express policy or custom. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766, n.6 (7th Cir. 2002); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). *Monell* liability attaches when an express policy, a widespread practice, or a person with final policymaking authority is the moving force behind a constitutional violation. *McTigue v. City of Chi.*, 60 F.3d 381, 382 (7th Cir. 1995). "[T]o survive a motion to dismiss, a plaintiff must 'plead factual content that allows the court to draw the reasonable inference that the [defendant] maintained a policy, custom, or practice' that was the moving force behind the constitutional violations." *Freeman v. City of Crown Point*, 2014 U.S. Dist. LEXIS 16595, at *23 (N.D. Ind. Feb. 11, 2014) (quoting *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011)).

Three situations that may potentially give rise to a *Monell* claim include,

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a wide-spread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy making authority.

*Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) (citation and quotation marks omitted). The Seventh Circuit has held that in cases involving a "widespread practice" or "gaps in express policies," the complaint must plead facts that show "there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

In arguing for dismissal, CCS asserts,

> Plaintiff's First Amended Complaint alleges that multiple CCS *staff members* failed to obtain language assistance services during their interactions with Maxis, and that as a result, Maxis failed to receive constitutionally adequate medical care which resulted in harm to him. The only real substantive difference between Plaintiff's original Complaint and the First Amended Complaint is the detailed account of each specific staff member's failure to obtain translation services. **Plaintiff has actually pled that CCS had adequate policies and systems in place, i.e. the language assistance line, but that CCS staff failed to use it on certain occasions. Those facts do not support a *Monell* claim against CCS and in fact, they actually refute a *Monell* claim against CCS.** At best, Plaintiff's First Amended Complaint states a claim of deliberate indifference against multiple CCS staff members, but Plaintiff has only sued CCS. It has been well established that constitutional claims brought under 42 U.S.C. § 1983 against a corporation like CCS cannot be based upon a theory of *respondeat superior*. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993); *see also Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (holding that "a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights"). Plaintiff has failed to plead any facts which would show that CCS staff members' failure to obtain language assistance was the result of a CCS express policy (or lack thereof), a widespread practice, or the actions of an individual with policy making authority.

([Filing No. 54 at 8](#)–9 (emphasis in original).)

CCS explains that Maxis' Amended Complaint actually alleges that the language line and/or translation services were available to CCS staff, and some staff used the services while other staff failed to use the services. Therefore, Maxis has not stated a claim against CCS for any unconstitutional policy or practice; rather, he has pled allegations against employees for failing to follow policy. Thus, CCS argues, the *Monell* claim must be dismissed.

Maxis responds that CCS has adequate notice regarding the *Monell* claim and the sufficient factual basis to support the claim. Over the course of six days, he was seen approximately ten times by at least twelve members of CCS's staff. Of the ten interactions, eight interactions occurred without the assistance of the language line, Google Translate, or a translator. During

some of the interactions, CCS staff noted that arrangements had to be made through jail staff to obtain translation services.

Maxis contends that, despite CCS's argument that its adequate policies and systems were simply disregarded by a few bad employees, the reasonable inference to be made from the well-pleaded facts is that the use and availability of translation services by CCS employees is an exception and not an adequate policy. He argues the allegations in the Amended Complaint show a widespread custom, policy, or practice that resulted in at least eighty percent of Maxis' treatment occurring without the use of translation services. Multiple CCS employees of various positions and titles, during various shifts over the course of six days, failed to meaningfully communicate with and treat Maxis and failed to obtain accurate or complete assessments of his health. Maxis argues these facts support a *Monell* claim against CCS.

Maxis *Monell* claim against CCS is brought in "Count XIII," which alleges, "while numerous members of CCS staff knew that that there was a language barrier that prevented them from directly and/or competently evaluating, assessing, and/or treating Mr. Maxis' medical condition, CCS staff failed on numerous independent occasions to obtain translation either through a language line or through an in-person translator." ([Filing No. 47 at 25](Filing No. 47 at 25).) "CCS's failure resulted in CCS staff failing to adequately evaluate, assess, and/or treat Mr. Maxis and his serious medical condition." *Id.* at 26. "As a result of that failure, Mr. Maxis was denied constitutionally mandated evaluation, assessment, and/or treatment for his serious medical conditions." *Id.* "CCS maintained that custom or practice with the force of law that resulted in some or all of Mr. Maxis' injuries." *Id.* "A culture of indifference and tolerance of employees' actions in failing to obtain interpreter services to competently evaluate, assess, and/or treat has permeated the department." *Id.* "CCS had inadequate training concerning the constitutional rights of individuals to obtain competent

medical treatment despite a language barrier. That failure to train amounted to the deliberate indifference to Mr. Maxis." *Id.*

The allegations under Count XIII are primarily legal conclusions or recitations of the elements of a *Monell* claim or constitutional violations. The allegations also consist of unsupported conclusions of fact such as Maxis' conclusion that CCS has a "culture of indifference and tolerance of employees' actions in failing to obtain interpreter services to competently evaluate, assess, and/or treat has permeated the department" or that "CCS had inadequate training concerning constitutional rights." The factual allegations do not support Maxis' conclusions regarding CCS's permeating culture or training. The allegation that some CCS staff noted having to arrange for translation services through the jail staff when providing medical services to inmates at the jail does not show a lack of policy or practice or an inadequate policy or practice. Rather, it shows that procedures were in place at the jail to obtain translation services when treating inmates.

The allegations of the Amended Complaint do not support an inference that CCS had a policy of not using translation services when providing medical treatment to Maxis or other non-English speaking inmates at Marion County Jail. Nor do the allegations show a widespread practice or custom of not using translation services when providing medical treatment. The allegations also do not show a lack of a policy where a policy was needed regarding translation services.

The factual allegations show that translation services were available, but some staff members neglected to utilize the services. In one such situation, Maxis alleges that the CCS staff member did not think translation services were necessary because Maxis "was able to make gestures and 'followed command[s].'" (Filing No. 47 at 6.) In another situation, it was not reasonable to expect translation services to be utilized because "Maxis was sleeping and would

11

not wake up, but [] he was breathing." *Id.* at 9. No translation services were needed because Maxis was asleep. Maxis also alleges that Ms. Andrews intended to use the language line to assist with his assessment after he returned from court, *id.* at 10, and LPN Hill noted on a different occasion that jail staff was arranging for a translator to assist. *Id.* at 12. Maxis acknowledged that translation services were utilized on two other occasions.

The Amended Complaint does not plead a widespread custom, policy, or practice of CCS that results in constitutional deprivations. Rather, the pleadings describe various occasions where medical staff used translation services, appeared to determine that translation services were unnecessary, or neglected to use the available translation services. This does not support a viable *Monell* claim against CCS.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** CCS's Motion to Dismiss Plaintiff's First Amended Complaint ([Filing No. 53](Filing No. 53)). Count XIII, the *Monell* claim brought against CCS, is **dismissed with prejudice.** With no other claims asserted against it, CCS is **terminated** as a defendant in this matter. All claims asserted against the other defendants remain pending.

**SO ORDERED.**

Date: 5/1/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

| | |
|---|---|
| Alex Ooley<br>BOEHL STOPHER & GRAVES, LLP<br>aooley@bsg-in.com | Erman M. Ooley<br>BOEHL STOPHER & GRAVES, LLP<br>mikeooley@bsg-in.com |
| Bradley A. Keffer<br>KEFFER BARNHART LLP<br>keffer@kbindy.com | Anne Celeste Harrigan<br>OFFICE OF CORPORATION COUNSEL<br>anne.harrigan@indy.gov |
| Brooke Smith<br>KEFFER BARNHART LLP<br>Smith@KBindy.com | Carol A. Dillon<br>BLEEKE DILLON CRANDALL, P.C.<br>carol@bleekedilloncrandall.com |
| Curtis Paul Moutardier<br>BOEHL STOPHER & GRAVES LLP<br>cmoutardier@bsg-in.com | Christopher Andrew Farrington<br>BLEEKE DILLON CRANDALL, P.C.<br>drew@bleekedilloncrandall.com |